**U.S. Department of Justice**
*United States Attorney's Office*
*District of New Jersey*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

December 19, 2025

The Honorable James B. Clark, III
United States District Court
Martin Luther King, Jr. Building
& U.S. Courthouse
Newark, New Jersey 07102

Re: United States v. Ozol, Mag. No. 25-12107

Dear Judge Clark:

The United States opposes defendant Matthew Ozol's Motion for Pretrial Release (the "Motion"). ECF No. 11.

The Defendant is a former teacher who, between at least 2022 and his August 2025 arrest, distributed and solicited child pornography (child sexual abuse material or "CSAM"), wrote about his desire to rape babies, and earned thousands of dollars a month from curating pornography viewing sessions. While the Defendant dismisses his conduct as "extremely narrow and circumscribed," "entirely in the digital world," *see* Mot. at 1, and the product of the uniquity of the Internet and his desire to impress others, *see, e.g.*, Yeoman Rep. at 6, 12, the reality is that for several years the Defendant:

- Distributed and solicited CSAM in *multiple chat groups* on *multiple encrypted messaging applications*, *see, e.g.*, Exs. A[1] at 2–5 (report summarizing CSAM the Defendant distributed in November 2024) and B at 2–5 (report summarizing CSAM seized from the Defendant's phone in August 2025),

- Exchanged text messages with an individual who appeared to live near him ("Individual-1"), in which the Defendant sought to meet Individual-1 in person and introduce him to CSAM, *see, e.g.*, Ex. C at 2 ("*You wanna see a middle schooler? A fourth grader? A kindergartner? A toddler? A baby?*" and *"babies look so hot covered in cum*") (emphases added),

[1] The referenced exhibits are submitted under seal.

- Wrote about his desire to sexually abuse children, *see, e.g.* Ex. D ("*i need a fuckin baby to rape asap*") (emphasis added).

The evidence in this case is strong. It includes an electronic device seized from near the Defendant's person in his residence (where he lived alone) that contained at least hundreds of depictions of CSAM and discussions acknowledging those depictions. *See, e.g.*, Exs. B, C, D, E (picture of device taken during search), F (same). And while the Defendant's expert report (the "Yeoman Report") does not meaningfully engage many relevant facts, it effectively concedes that the Defendant *possessed CSAM*, *knew it was wrong*, and is guilty of the charged offense. *See* Yeoman Rep. at 6 (the Defendant began viewing and collecting CSAM), 7 (the Defendant deleted 100 CSAM videos he had).

In short, the Defendant poses a substantial danger to the community. To use his own words: "I haven't done anything with a baby, but *if given the opportunity I am 100% certain I would do it.*" *See* Ex. D at 2 (emphasis added).

The Court should deny the Motion.

## I. PROCEDURAL BACKGROUND

In November 2024, the Defendant participated in a chat group named "Baby Rapist." The Defendant shared a file containing a compilation of approximately 34 videos of CSAM, including:

- still image of a naked female infant, partial erect male penis, and text: "Baby Paradise Try Not To Cum Challenge" and "Dedicated For Those People Who Love Child Pornography"
- video of a naked female infant being digitally penetrated
- video of a naked infant and a man attempting to insert his erect penis in the infant's anus as the infant begins to cry
- video of an adult male holding down an infant's legs while he penetrates her
- video of an infant in a diaper while an adult male begins to penetrate the infant and the infant begins to cry

*See* Ex. A at 2–5.

The Defendant also made the following statements in the Baby Rapist chat group:

- "I haven't done anything with a baby, but if given the opportunity I am 100% certain I would do it."

- "I've done some questionable things already re:consent (drugging, . . . , outright raping 2 adult men, about a dozen statutory rapes with 15-17 yo boys). My biggest concern , outside of getting caught, is not being able to last more than a couple pumps lol. It's my ultimate fantasy to wreck a little baby hole with my . . . cock and in afraid when I get in there I'm not going to do enough damage before I cum lol."

- "does anyone have any other videos from damian (aka big nazi cock aka perv pusher) to share? this is the only one i could find again after scrubbing everything a few months back."

- "i need a fuckin baby to rape asap."

- "Jerk off to pedo videos. It's safe if you're cautious. Use a VPN, don't use your real name, don't follow any links anyone posts in the chat."

- "I'm new to [the application], only really been on here like a day and a half. if anyone has any groups they can add me to, I'd appreciate it. i have lots of material to share, as you can see from my contributions here hehe."

*See* Ex. D at 2.

On August 5, 2025, law enforcement executed a search warrant at the Defendant's residence. At the time, the Defendant was alone in his residence and participating in a video chat. As law enforcement entered the residence, other participants in the video chat left the screens. Law enforcement took the pictures of communications from on the Defendant's screen that included the following text:

- "I have gay, solo, teen, young boy, young girl, dad & son, mom & son, girl rape . . . Message if you are interested in buying." The visible URL includes the text "sellteenrape." *See* Ex. F (cleaned up).

- "i wanna slam my little nephews and watch someone use them." *See* Ex. E.

Law enforcement's review of the Defendant's phone revealed a large number of images and videos of CSAM and communications about sexually abusing children.

For example, the Defendant sent the following messages to Individual-1 in 2022:

- "I 'accidentally' found some [application] groups that share some pervy porn and 'somehow' got a link to a mega drive with like 3000 files."
- "I found some very hot videos of very young boys and girls having their tiny holes opened up and I wanna fuck you while we watch them."
- "How young would you wanna see in a video? If such a thing we legal and in one of our possession."
- "You wanna see a middle schooler? A fourth grader? A kindergartner? A toddler? A baby?"
- "I got some hot baby vids that make me cum so hard. I'm a total twisted pedo meth junkie now."
- "babies look so hot covered in cum, it's really unbelievable."

*See* Ex. C at 2-3.

The Defendant also participated in the following chat groups on a second encrypted messaging application: "PedFilth" (containing approximately 132 depictions of CSAM), "Cute boys and Yummy Lads" (approximately 310 depictions), and "Perv Pals" (approximately 187 depictions). *See* Ex. C at 2–3. Those groups also contained conversations about child sexual abuse.

The Defendant was charged by Complaint with one count of possession of child pornography ("CSAM") depicting minors under age 12. *See* ECF No. 1. The Court entered multiple orders continuing Speedy Trial Act deadlines on the "joint application" of the parties, in part because the "pre-indictment discovery the United States has voluntarily provided to the Defendant involves materials that defense counsel requires adequate time to review" and the Defendant desired "additional time to negotiate a plea agreement." *See* ECF Nos. 5, 10, 13.

## II. STATUTORY BACKGROUND

Pretrial release and detention is governed by the Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141–56. Section 3142(c) governs release on conditions pending trial, and directs a court to release a defendant "subject to the least restrictive . . . condition, or combination of conditions" the court "determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). Section 3142(g) provides several factors that a court must consider in making that determination, including "the nature and circumstances of the offense charged" and "the history and characteristics" of the defendant.

The Bail Reform Act "is the Congressional expression of concern about a group of dangerous defendants as to whom neither stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." *United States v. Carswell*, 144 F. Supp. 2d 123, 128 (N.D.N.Y. 2001). Thus, "where there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." *United States v. Colombo*, 777 F.2d 96, 98–99 (2d Cir. 1985) (alteration omitted). "Recidivism was a substantial motivating factor leading to the Congressional enactment of the Bail Reform Act. As the Supreme Court observed in *United States v. Salerno*, 481 U.S. 739, 742 (1987), 'responding to the alarming problem of crimes committed by persons on release, Congress formulated the Bail Reform Act of 1984 as the solution to a bail crisis in federal courts.'" *Carswell*, 144 F. Supp. 2d at 128 (alteration omitted). Critically, "conditions dependent upon good faith compliance are sometimes insufficient when a defendant's criminal history provides no basis for believing good faith will be forthcoming." *Id.* (citing *United States v. Tortora*, 922 F.2d 880, 886–87 (1st Cir. 1990)).

The Bail Reform Act's focus on ensuring the safety of the community is not limited to "violence" in the colloquial sense. A Senate Report statement pertaining to the Bail Reform Act states that "language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence." S. Rep. No. 225 98th Cong., 1st Sess. 6-7, reprinted in 1984 U.S. Code. Cong. & Admin. News 3182, 3195–96; *see also United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting Senate Report).

## III. THE DEFENDANT SHOULD BE DETAINED

### A. THE DEFENDANT PRESENTS A SUBSTANTIAL DANGER TO THE COMMUNITY

The Defendant should be detained because he presents a substantial danger to the community.

#### i. The Defendant's History and Circumstances Support Detention

The Defendant's "history and characteristics" support detention. *See* 18 U.S.C. 3142(g)(3).

**First, the Defendant distributed and solicited CSAM for multiple years**. This conduct does not merely live "entirely in the digital world," *see* Mot. at 1, but involved the Defendant seeking to meet others *in person* to view CSAM. As the Defendant wrote to Individual-1 in 2022: "I found some very hot videos of very young boys and girls having their tiny holes opened up and I wanna fuck you while we watch them." *See* Ex. C at 2.

The Defendant is not on the outskirts of the CSAM community. He solicits CSAM: "does anyone have any other videos from damian (aka big nazi cock aka perv pusher) to share? this is the only one i could find again after scrubbing everything a few months back." Ex D at 2. And his solicitations are effective because he has a large quantity of CSAM to distribute: "if anyone has any groups they can add me to, I'd appreciate it. i have lots of material to share, as you can see from my contributions here hehe." Ex. D at 2.

The Defendant joined multiple other CSAM chat groups on another platform, including one group that appears to have been active between July 2023 and September 2023, another group that appears to have been active between August 2023 and November 2023, and another group that appears to have been active between August 2023 and May 2024. Ex. C at 2–3. And on the day of the Defendant's arrest, a review of visible devices showed multiple messages regarding child sexual abuse or the sale of CSAM. *See* Exs. E, F.

The Defendant's assertion that his former employment as a teacher shows that "he has served as a positive role model and steward for children," *see* Mot. at 9, is divorced from reality. The truth is that in 2022—*very shortly* after he stopped working as a public school teacher—the Defendant implored Individual-1 to meet him in person and view CSAM together while the Defendant *characterized the victims of child rape by their grade in school*: "You wanna see a middle schooler? A fourth grader? A kindergartner? A toddler? A baby?" Ex. C. at 2. The Defendant—during *the same calendar year* in which

he was a teacher—bragged to Individual-1 that he "got a link to a mega drive with like 3000 files" of CSAM. Ex C. at 2.

The Defendant's conduct was not an aberration or single lapse in judgment. It was not brought on by stress from the COVID-19 pandemic. It represented his repeated decisions, over the course of many years, to traffic in depictions of children, toddlers, and infants being raped for his own gratification. He believes "babies look so hot covered in cum," *see* Ex. C at 2, and "need[s] a fuckin baby to rape asap," Ex D. at 2. He is not "a positive role model and steward for children." *See* Mot. at 9. He is a former public school teacher who, through his employment, had established direct personal relationships with many children, while also finding gratification in watching other children be sexually abused.

**Second, the Defendant has—at a minimum—fantasized about committing hands-on abuse of children**. His own words are unambiguous:

- "I haven't done anything with a baby, but if given the opportunity I am 100% certain I would do it."
- "i need a fuckin baby to rape asap."
- "I've done some questionable things already re:consent (drugging, . . . , outright raping 2 adult men, about a dozen statutory rapes with 15-17 yo boys). My biggest concern , outside of getting caught, is not being able to last more than a couple pumps lol. It's my ultimate fantasy to wreck a little baby hole with my . . . cock and in afraid when I get in there I'm not going to do enough damage before I cum lol."

Ex. D at 2.

These words reflect the danger to the community posed by the Defendant. Even if he had not committed all of the conduct he claimed ("raping 2 adult men, about a dozen statutory rapes with 15-17" year olds"), he has plainly identified specific sex acts and specific types of victims he would target—some of whom match the profile of the students he used to teach.

**Third, the Defendant has taken steps to conceal his illegal conduct**. As he instructed others: "Jerk off to pedo videos. It's safe if you're cautious. Use a VPN, don't use your real name, don't follow any links anyone posts in the chat." Ex. D at 2 (also referring to "scrubbing everything a few months back").

**ii. The Nature and Circumstances of the Offense Charged Supports Detention**

The “nature and circumstances of the offense charged” supports detention. *See* 18 U.S.C. 3142(g)(1).

As described above, the offense conduct is extremely serious and warrants detention. Over multiple years, the Defendant distributed and solicited a large number of videos of children being raped. Each instance of the Defendant’s possession of those depictions—not to mention his distribution or solicitation—caused substantial harm to the victims of those serious offenses, who are revictimized each time someone possesses or shares a depiction of their abuse. Many of the videos described in the attached exhibits depict the rape or sexual abuse of infants or toddlers, and the Defendant has repeatedly described his desire to *obtain* more videos, *distribute* more videos, and commit hands-on sexual abuse.

**iii. The Weight of the Evidence Supports Detention**

The “weight of the evidence” supports detention. *See* 18 U.S.C. 3142(g)(2).

The evidence in this case is strong. The Defendant’s phone was seized pursuant to a search warrant. The Defendant’s phone belonged to him: it was seized from his residence (where he lived alone) and near his person. The phone is associated with the Defendant’s e-mail account and appears to contain photos of the Defendant. ECF No. 1.

And the phone shows the Defendant knowingly possessed (and distributed and solicited) CSAM. As set forth above, and in the attached exhibits, the Defendant participated in multiple CSAM-related exchanges across multiple applications. *See* Exs. B at 2–3, C at 2–3. He knew the images and videos contained depictions of infants and toddlers, because, and as noted above, that’s how he described them to others.

The Defendant dismissed the weight of the evidence as “uncertain.” *See* Mot. at 8. It is not. And the strength of the evidence is confirmed by the Yeoman Report, which refers to the Defendant viewing and collecting CSAM, and deleting 100 CSAM videos he had. *See* Yeoman Rep. at 6, 7; *see also* Yeoman Rep. at 6 (describing how the Defendant earned thousands of dollars each month to host online pornography rooms and curate pornography); Exs. A, B, C, D.

**iv. The Nature and Seriousness of the Danger Posed Supports Detention**

The "nature and seriousness of the danger . . . posed by the person's release" supports detention. *See* 18 U.S.C. 3142(g)(4).

The Defendant's release threatens to put children at risk of continued trafficking in videos of their sexual abuse, and to put additional children at risk of being abused by the Defendant. While the Defendant dismisses *his own claims to have committed sexual abuse*, *see* Yeoman Rep. at 3 n.2, his words at a minimum show his interest in committing hands-on sexual abuse of children.

Far from being "a positive role model and steward for children," *see* Mot. at 9, he is the very danger parents fear.

**v. The Yeoman Report Does Not Support Release**

The Yeoman Report does not support release. It repeatedly confirms that the Defendant possessed CSAM. *See, e.g.*, Yeoman Rep. at 6, 7. And its author's conclusion that the Defendant (who presumably paid for the report, though it contains no such disclosure) should be released is entitled to marginal weight, given the likelihood of bias, apparent failure to grapple with the full scope of the offense conduct, and inconsistent analysis.

For example, the Yeoman Report appears to have considered the Complaint and two reports. *See* Yeoman Rep. at 1. But the investigation has yielded multiple reports and other evidence, which do not appear to have been considered.[2]

For example, the Yeoman Report does not explain the basis for the CPORT, CASIC, or STABLE-2007 scores, and offers zero points for volunteering in a role with high access to children (despite the Defendant being a former teacher) and child pornography text stories (despite repeated descriptions of his desire to commit hands-on offenses).

The Yeoman Report also dismisses the prospect of the Defendant's preferential pedophiliac sexual interest in children because, notwithstanding the Defendant's access to thousands of files of CSAM, *see* Exs. B at 2–3 (access to at least 600 depictions of CSAM), C at 2 ("I 'accidentally' found some [application] groups that share some pervy porn and 'somehow' got a link to a

[2] The United States previously advised defense counsel and prior defense counsel (including on the day of the Defendant's initial appearance) that it would make seized electronics available for inspection at the Department of Homeland Security.

mega drive with like 3000 files."), he apparently lacks an extensive collection of CSAM, *see* Yeoman Rep. at 11.

Nor does the Yeoman Report reconcile its conclusion that the Defendant's conduct is based on the perceived anonymity and ubiquitous availability of the Internet, *see* Yeoman Rep. at 12, with the Defendant's attempt to meet Individual-1 in person and view CSAM, *see* Ex. C at 2 ("I found some very hot videos of very young boys and girls having their tiny holes opened up and I wanna fuck you while we watch them."). And the report does not even attempt to address the Defendant's descriptions of past abuse he committed and wants to commit, beyond dismissing "everything he said" as "untrue and part of the fantasy role play," Yeoman Rep. at 3 n.2, notwithstanding the fact that many things the Defendant said—including about his access to CSAM and interest in acquiring more CSAM, *see* Ex. D at 2—were corroborated by the results of the search.

### B. THE DEFENDANT ALSO PRESENTS A SUBSTANTIAL RISK OF FLIGHT

The Defendant should also be detained because he presents a substantial risk of flight.

The Defendant faces a statutory maximum of 20 years in prison on the one count charged in the complaint. ECF No. 1. An Indictment could include additional charges that carry additional or more serious penalties. Regardless, the Defendant faces a potential advisory Guidelines range that calls for a significant sentence. He has substantial incentive to flee, particularly as the investigation continues and could further increase his exposure.

### C. HOME INCARCERATION IS NOT A SUFFICIENT CONDITION

The Defendant's proposed bail package relies on home detention with his parents. The strategy of relying on a third-party custodian is insufficient where, as here, the offense conduct can easily be committed at that location. That is particularly true because the Defendant has experience concealing his conduct from others, including law enforcement. *See* Ex. D at 2 ("Jerk off to pedo videos. It's safe if you're cautious. Use a VPN, don't use your real name, don't follow any links anyone posts in the chat."), Yeoman Report at 4 (referring to the Defendant concealing the offense conduct from his parents).

Home incarceration cannot prevent criminal conduct or flight, only alert law enforcement to flight after the fact. Where the Defendant has every incentive to flee to escape a significant sentence, an after-the-fact alert is not

adequate. And it is particularly unhelpful because of the risk of danger that the Defendant's flight—and law enforcement's pursuit of him—would cause.

## IV. CONCLUSION

The statutory factors weigh heavily in favor of detention. For these reasons, the Government respectfully submits that the Motion should be denied.

Respectfully submitted,

TODD BLANCHE
U.S. Deputy Attorney General

PHILIP LAMPARELLO
Senior Counsel

By: *_/s/ Matthew Specht_*
MATTHEW SPECHT
Assistant U.S. Attorney

cc: Counsel for the Defendant (via ECF)